522

COMPETITIVE
TELECOMMUNICATIONS
ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Sprint Communications Company
L.P., et al., Intervenors.

Nos. 95–1168, 95–1170.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 23, 1996.

Decided July 5, 1996.

with whom David W. Carpenter, Mark C. Rosenblum, Peter H. Jacoby and Judy Sello, Basking Ridge, NJ, were on the briefs. Robert E. McKee, Honolulu, HI, entered an appearance.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, Washington, DC, argued the cause for respondents, with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, and Carl D. Lawson, Counsel, were on the brief. Robert J. Wiggers and Robert B. Nicholson, Attorneys, United States Department of Justice, entered appearances.

Michael J. Shortley, Washington, DC, for Rochester Telephone Corporation, argued the cause for the Local Exchange Carrier Intervenors, with whom Michael S. Pabian, Ameritech Operating Companies, Richard McKenna, Irving, TX, GTE Service Corporation, Robert B. McKenna, Washington, DC, U.S. West Communications, Inc., John W. Bogy, Lucille M. Mates, San Franciso, CA, James L. Wurtz and Margaret E. Garber, Reno, NV, Pacific Bell and Nevada Bell, Robert M. Lynch, Durward D. Dupre and Thomas A. Pajda, St. Louis, MO, Southwestern Bell Telephone Company were on the brief.

Robert J. Aamoth, and Genevieve Morelli, Alexandria, VA, Competitive Telecommunications Association, Peter A. Rohrbach and Karis A. Hastings, Washington, DC, WorldCom Network Services, Inc., Leon M. Kestenbaum and H. Richard Juhnke, Sprint Communications, Inc., and Frank W. Krogh and Donald J. Elardo, Washington, DC, MCI Telecommunications, were on the brief for the Interexchange Intervenors.

Benjamin H. Dickens, Jr. and Brian D. Robinson, Washington, DC, were on the brief for intervenor Minnesota Independent Equal Access Corporation, Inc.

Leon M. Kestenbaum and H. Richard Juhnke, Sprint Communications, Inc., and Peter A. Rohrbecht and Karis A. Hastings, Washington, DC, WorldCom Network Services, Inc., were on the joint brief of Intervenors in support of Competitive Telecommunications Association.

Robert J. Aamoth, Washington, DC, argued the cause for petitioner Competitive Telecommunications Association, with whom Genevieve Morelli, Alexandria, VA, was on the briefs.

Peter D. Keisler, Washington, DC, argued the cause for petitioner AT&T Corporation,

Mark C. Rosenblum, Basking Ridge, NJ, Lawrence R. Sidman, Washington, DC, James P. Tuthill, San Francisco, CA, Gail L. Polivy, Washington, DC, David Cosson, Lakewood, CO, Linda L. Kent, Charles D. Cosson, Basking Ridge, NJ, Matthew R. Sutherland, Atlanta, GA, Edward R. Wholl, Joseph Di Bella, James S. Blaszak, Washington, DC, James R. Young, Boulder, CO, Lawrence W. Katz and Michael E. Glover, Arlington, VA, entered appearances.

Before: EDWARDS, Chief Judge, SILBERMAN and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Local phone companies, known as local exchange carriers (LECs), receive a fee for providing long distance phone companies, known as interexchange carriers (IXCs), with access to their customers. In 1992 the Federal Communications Commission adopted an interim rate structure that governs the access charges that IXCs pay to LECs. Petitioner AT&T protests that the interim structure is not cost-based and compels the large IXCs with dedicated access lines, for which they pay a flat rate, to subsidize the smaller IXCs, which use shared ("common") access lines with charges based upon usage. Petitioner Competitive Telecommunications Association (CompTel), a trade association with over 150 IXC members, asserts that the cost allocation procedures underlying the interim structure favor the largest volume IXCs at the expense of smaller volume IXCs.

An IXC connects to its long distance customers by using either special access or switched access facilities. Special access is accomplished in one step via a private, dedicated line—either a large capacity DS3 line or a smaller capacity DS1 line—provided by an LEC and running directly from the customer to the IXC. Special access is economical for only the largest volume long distance users. Switched access is accomplished in two steps: first, the customer is connected to the LEC end office using lines in common with other LEC long distance and local customers; second, the LEC end office is connected to the IXC. This second step is known as local transport service; it accounts for roughly one-third of the switched access fees, which in turn account for roughly 40% of the total cost of a long distance call. Once the customer's call reaches the IXC, by either a special or a switched access arrangement, the IXC's long distance network transports the call to the point nearest its destination, at which the IXC interconnects with the LEC on the receiving end. That LEC then provides access from the IXC to the receiving customer—again by either special access or switched access facilities.

Local transport—the step with which the parties here are concerned—can be provided over a dedicated line (used by the largest IXCs) or over a common line (used by smaller IXCs). Dedicated service is available from either an LEC or a Competitive Access Provider; the service runs from a single LEC end office to a single IXC. Under the FCC's interim rate structure, dedicated service is priced at a flat rate independent of usage. Common line service differs from dedicated service in several respects. First, calls are transported on lines that are shared between the LEC's local and IXC customers. Second, common line facilities handle calls to and from more than one LEC end office. Third, under the interim rate structure, the price of common line service is usage-based, i.e., per minute of access. Fourth, calls transported over common lines must pass through an LEC Serving Wire Center before they are transmitted to an IXC's "point of presence."

Two methods of local transport service are offered over common lines. Under the first method, direct trunked transport (DTT), calls are transported from an LEC end office to the Serving Wire Center by means of a direct trunk line, which is either a DS1 or a DS3. Alternatively, calls are routed through a tandem switch prior to reaching the Serving Wire Center. Calls travel over a common line from an LEC end office to the tandem switch, then over either a dedicated (DS1 or DS3) line or a common line from the tandem switch to the Serving Wire Center. The charge per minute for the transmission

from the end office to the Serving Wire Center is known as the TST–T (tandem-switched transport—transmission) rate. In addition, there is a per-minute charge for using the tandem switch, known as the TST–S (tandem-switched transport—switch) rate.

The interim rate schedule adopted by the FCC replaced the "equal charge rule," which required that the same per-minute rate be charged for all local transport service, both dedicated and common line. In order to protect the newer and smaller IXCs under the interim structure, the Commission decided that the usage charge for common line service should not cover the full cost of the tandem switch. But then, in order to assure that the interim schedule was revenue-neutral for the LECs, the Commission needed a means by which the LECs could collect the remainder of the tandem switch cost. For this purpose, the Commission created a new Residual Interconnection Charge (RIC)—a per-minute charge levied upon both dedicated and common line users of local transport services.

AT&T, which makes extensive use of dedicated local transport, contends that the RIC is simply a subsidy paid by IXCs that use dedicated lines on behalf of IXCs that use common lines—unrelated to the cost of dedicated service and imposed by the Commission without adequate explanation or justification. According to AT&T, the Commission's refusal to adopt cost-based pricing has raised rates for consumers, encouraged inefficiencies in the construction and operation of facilities, and discouraged competition in the provision of access services. The principal effect of the interim rate structure, argues AT&T, has been to protect smaller long distance carriers at the expense of the public, which "is *not* the objective or role assigned by law to the Federal Communications Commission." *Hawaiian Tel. Co. v. FCC,* 498 F.2d 771, 776 (D.C.Cir.1974).

The Minnesota Independent Equal Access Corporation (MIEAC) intervened before the FCC in support of AT&T. Consisting of 64 participating LECs, MIEAC provides Centralized Equal Access (CEA) services, specifically tandem-switched transport, to IXCs operating in Minnesota, in competition with large LECs (principally U.S. West Communications, Inc.) and other access providers. Because the FCC determined that CEA assists rural long distance users who might otherwise be without comparable service, the Commission has exempted providers such as MIEAC from the interim rate structure. The same conditions, however, that oblige AT&T to pay the RIC even on AT&T's dedicated lines force providers of CEA to compete against the LECs' subsidized rates for the provision of local transport over common lines.

CompTel raises two issues in its petition. First, the petitioner argues that under the rules of the interim rate structure, excessive overhead is allocated to the tandem switch, resulting in a TST–S rate that is too high. IXCs that pay the TST–S rate are, according to CompTel, thereby disadvantaged in competing against larger IXCs that use DTT, dedicated, or special access lines. Second, CompTel objects to "market pricing" of the DTT service that the LECs provide over switched access lines. Within the terms of the interim schedule, LECs are permitted to allocate costs disproportionate to capacity— *i.e.,* high costs are allocated to low capacity DS1 service, for which there is little competition, and lower costs are allocated to high capacity DS3 service, which competes against special access and other dedicated transport. In CompTel's view, this scheme impermissibly discriminates against DS1 customers.

Sprint Communications and WilTel Network Services intervene in support of CompTel. Sprint and WilTel each operate a nationwide fiber optic transmission network that connects through LECs using DS1 lines in order to originate and terminate long distance calls. Both companies compete against AT&T, which is the only long distance carrier with sufficient volume to make the use of DS3 lines cost-effective. Sprint and WilTel contend that the interim rate structure adopted by the FCC artificially increases their access cost while it lowers AT&T's.

CompTel, Sprint, and WilTel join with MCI (collectively referred to as the IXC Intervenors) in support of the FCC on the issues raised in AT&T's petition. Affiliates of Ameritech, GTE, Pacific Telesis, Roch-

ester Telephone, Southwestern Bell, and U.S. West (collectively referred to as the LEC Intervenors) join in support of the FCC and in opposition to the petitions of both AT&T and CompTel.

For the reasons set out below, we grant AT&T's petition for review. Upon remand, the Commission must either move expeditiously to a cost-based alternative to the RIC, or provide a reasoned explanation why a departure from a cost-based system is necessary and desirable. We also grant CompTel's petition for review of the Commission's scheme for assigning overhead to the tandem switch component. The Commission has not shown either that its allocation is cost-related or that a departure from a cost basis is justified. We deny, however, that portion of CompTel's petition directed at the ratio of DS3 to DS1 overhead. To the extent that the Commission's treatment of that issue departs from cost-based pricing, the departure is consistent with past practice and the Commission offered adequate support for the approach that it chose.

## I. Background

The FCC rulings that we review date from 1992 to 1994, but they are only part of a story that begins in 1983 when the Commission mandated that rates be cost-based. *Third Report and Order, MTS and WATS Market Structure,* 93 F.C.C.2d 241 (*1983 Access Order*). To that end, the Commission adopted new (47 C.F.R.) Part 69 regulations, directing in part that cost be allocated between common and dedicated transport service. IXCs were to pay in accordance with their relative use of each service.

The FCC soon waived the Part 69 rules, however, in order to accommodate the settlement of the Government's antitrust suit against AT&T. *United States v. AT&T,* 552 F.Supp. 131 (D.D.C.1982) (Modification of Final Judgment or MFJ), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). As part of that settlement AT&T agreed to divest itself of the Bell Operating Companies, which are LECs that would thereafter be required to offer "equal access" to all IXC carriers. The MFJ also provided for equal per-minute pric-

ing of local transport services until September 1991; under this arrangement, an IXC would pay the same price per unit of traffic whether it used common or dedicated lines. The FCC's objective was to encourage entrance into the long distance market. AT&T already had extensive dedicated facilities in place as a result of its previously being vertically integrated with the Bell Operating Companies; by imposing equal charges for a period of years the Commission hoped to give the Bell companies sufficient time to develop tandem-switched transport networks to serve other IXCs.

Upon expiration of the equal-per-minute pricing provision of the MFJ in 1991, the Commission issued an order requiring the LECs to continue the equal charge scheme pending a new rulemaking proceeding. *Order and Further Notice of Proposed Rulemaking, Transport Rate Structure and Pricing,* 6 FCC Rcd. 5341, 5341 (1991). Tentatively, the FCC proposed a three-part rate consisting of a flat price for dedicated service, a usage-based charge for common line service, and a usage-based RIC reflecting costs not otherwise recovered. The RIC was to apply to each local transport user at the same rate per minute, *i.e.,* without regard to the actual cost that the LEC incurred in order to serve the particular local transport customer; it was "designed to reduce any unnecessary adverse effects on small and medium" IXCs and "to provide assistance to high cost areas." *Id.* at 5345 n. 49.

In October 1992 the FCC issued its *First Report and Order, Transport Rate Structure and Pricing,* 7 FCC Rcd. 7006, in which it repudiated the equal charge rule and adopted the three-part structure that had been outlined in 1991, while reaffirming the need ultimately to go to cost-based pricing. The temporary three-part rate moved in the direction of cost-based pricing, but because the per-minute charge for common lines recovered only 20% of the cost allocated to the tandem switch—in order to protect the smaller IXCs that used tandem-switched transport rather than DTT or other dedicated service—the Commission decided to capture the remaining 80% through the per-

minute RIC. Meanwhile, vowing to "proceed cautiously in this area" so as not to "endanger the availability of pluralistic supply in the interexchange market,"—that is, the survival of IXCs trying to compete with AT&T—the Commission decided to seek more comments directed at establishing a permanent rate structure. *Id.* at 7008.

AT&T objects that the interim RIC should have been levied not upon all traffic but only upon that portion of the traffic that is routed over tandem-switched lines. CompTel on the other hand contends that, notwithstanding the new RIC, the rates for switched access are still too high relative to the cost of service, primarily because overhead costs are disproportionately allocated to the TST-S component of the rate. Because the LECs use the same facilities for switched and special access, the Commission looked to special access rates as a starting point for TST-T and DTT switched access pricing. The result, according to CompTel, is to assign to TST-T and DTT facilities the low overhead associated with special access, thereby transferring an excessive burden to the TST-S rate for tandem switching. Even though the final TST-S rate recovers only 20% of the cost allocated to the tandem switch, CompTel claims that the amount thus recovered is greater than the amount that would be recovered if cost were properly allocated and recovered 100%. According to CompTel, the offending allocation favors large over small IXCs in general, and DTT over tandem switch users in particular.

In CompTel's view, the interim structure also penalizes smaller IXCs by adopting cost allocation procedures that favor DS3 over DS1 lines. Initially, the FCC permitted the LECs to adopt rates for transport over DS3 lines as low as 9.6 times their rates for transport over DS1 lines, although a DS3 line provides 28 times as much capacity as a DS1 line. Stated another way, the charge per voice circuit over a DS1 line could be nearly three times the charge per voice circuit over a DS3 line without triggering FCC scrutiny. CompTel claims that the only material difference in cost structure between the two types of line arises from the need for a certain piece of equipment (a 3:1 multiplexer) used

to provide DS1 service. Taking into account both the greater capacity of the DS3 line and the cost of the multiplexer for the DS1 line, CompTel estimates that a true cost-based rate for a DS3 line should be roughly 24 times the rate for a DS1 line. The Commission, however, has allowed LECs to engage in "market pricing" by their allocation of a disproportionately high share of overhead to DS1 customers.

The *First Report and Order* prescribed the rules pursuant to which LECs were to compute rates under the interim regime. Initial rates were to be filed in 1993; thereafter, prices would be indexed using the Commission's existing price cap rules. Under those rules, originally adopted in 1990, an LEC is permitted to escalate base period rates in accordance with a formula applied to a "basket" of transport services. The LEC has some flexibility regarding the rate for each specific service in the basket—a band of plus or minus five percent around the indexed price cap for the basket as a whole. Originally, all transport was a single service category within a basket of traffic-sensitive services, but in the *First Report and Order* the FCC created three separate transport categories: flat charge elements, tandem-switched elements, and interconnection. The order also modified two of the banding limits: from –5% to +2% for tandem-switched elements and from –100% to +0% for interconnection (*i.e.*, the rate could be set below but not above the indexed rate).

In its *Second Report and Order, Transport Rate Structure and Pricing,* 9 FCC Rcd. 615 (1994), the Commission further revised the price cap baskets and categories. Transport was removed from the traffic-sensitive basket and combined with special access in order to form a new trunking basket. The Commission retained separate categories and banding limits for tandem switching and interconnection, but it merged the flat rate, voice grade, and high capacity special access categories, creating DS1 and DS3 subcategories in the process. The Commission also rejected proposals to freeze the ratio of DS3 to DS1 rates, as well as proposals to raise the ratio to 20:1 or higher.

Several parties filed petitions for reconsideration of both the *First* and *Second Orders.* AT&T urged, among other things, that the Commission abandon its interim rate structure and move immediately to cost-based pricing. CompTel argued, again among other things, that the Commission should price tandem switching on an incremental cost basis, put tandem switching in the same price cap basket as other local switching, and adopt a uniform per-circuit allocation of overhead in setting DS1 and DS3 rates.

The Commission denied all the petitions, *Third Memorandum Opinion and Order on Reconsideration, Transport Rate Structure and Pricing,* 10 FCC Rcd. 3030, 3048 (1994), stating that under its interim rate structure IXCs would have "time to prepare for a fully cost-based rate structure by reconfiguring their networks and taking other steps to eliminate network inefficiencies." Over AT&T's objection, the FCC implemented the new RIC and assessed a per-minute charge upon all IXCs—both dedicated and common line transport users—designed to recover roughly 80% of the cost allocated to tandem switching. Contrary to CompTel's request, the Commission refused to price tandem switching on an incremental cost basis; it established an initial TST–S rate that reflected the overhead associated with providing switched access, while pricing DTT service to include the lower overhead allocated to special access. Also over CompTel's objection, the Commission approved a ratio of DS3 to DS1 rates corresponding to the ratio between rates charged on comparable special access lines, subject to a minimum of 9.6 to 1; and the Commission continued to afford some flexibility to LECs in revising their DS3 and DS1 rates periodically under the price cap rules.

Summarizing its positions on the issues addressed in the three orders on review, the Commission contends that it could not have effectuated a pure cost-based system and asserts that a usage-based RIC is the fairest means of recovering those costs that cannot be non-arbitrarily allocated. Further, the Commission argues that it could not have determined tandem switching cost with any greater certainty; that it fairly weighed the long-term competitive advantages of cost-based rates against the need temporarily to help smaller carriers; that its borrowing special access prices to serve as initial DTT charges is reasonable inasmuch as the two services use identical physical facilities; and that it was within the Commission's discretion to adhere to its existing price cap rules. The Commission notes that a fully cost-based structure would penalize low volume IXCs attempting to compete against AT&T, with its dedicated facilities already in place. At the same time, a fully usage-based system would subsidize low volume IXCs, who use more costly tandem-switched facilities. The Commission asserts that in balancing its conflicting objectives—more efficient use of transport facilities, competition in the provision of local transport, and competition among IXCs to serve long distance users—it has reached the interim accommodation most likely to benefit the public.

At the outset of oral argument we asked the parties to address the question whether their petitions for review were mooted in whole or in part by enactment of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, which substantially amended the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.,* under which this case arose. We were concerned that, were we to remand the matter to the FCC in order to provide any of the parties the prospective relief it requests, the Commission would instead be obliged to apply the provisions of the 1996 Act; the result might be that our opinion would have no binding effect. CompTel responded only that the 1996 Act mandates changes consistent with the relief that it seeks in this proceeding. AT&T, however, noted that it is asking for a cost-based structure and that the FCC has not yet determined whether such a structure is required by the new Act; accordingly, any relief granted to AT&T would be in effect at least until such time as the FCC promulgates new rules and regulations to implement the 1996 Act.

The Commission confirms that this case arises under, and will be resolved on remand pursuant to the terms of, the 1934 Act. Indeed, according to Commission counsel, the

agency has not even decided whether the 1996 Act applies to IXCs' interconnection with LECs; it may apply only to the access provided by LECs to Competitive Access Providers. In a recent Notice of Proposed Rulemaking, FCC 96–182 (April 19, 1996), *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, CC Docket No. 96–98, the Commission states:

> it would appear that the obligation to provide interconnection pursuant to section 251(c)(2) [of the 1996 Act] does not apply to telecommunications carriers requesting such interconnection for the purpose of originating or terminating interexchange traffic. This tentative conclusion seems consistent with section 251(I), which provides that "[n]othing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 [of the 1934 Act]" ... the statutory basis on which interexchange carriers have long been entitled to interconnect for the purposes of originating and terminating interexchange traffic.

*Id.* at 56. This Commission document, along with the statements of counsel at oral argument, gives us adequate assurance that today's decision construing the 1934 Act is not merely advisory.

## II.  Analysis

■  We review agency action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The court will not disturb the decision of an agency that has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

■  Sections 201(a) and (b) and 202(a) of the Communications Act of 1934, 47 U.S.C. §§ 201(a), (b) and 202(a), authorize the Commission to establish just and reasonable rates, provided that they are not unduly discriminatory. The FCC is not required to establish purely cost-based rates. *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1137 (D.C.Cir.1984); *see also National Rural Telecom Ass'n v. FCC*, 988 F.2d 174, 182–83 (D.C.Cir.1993) (affirming price cap regulation although not tied directly to cost). The Commission must, however, specially justify any rate differential that does not reflect cost. *ALLTEL Corp. v. FCC*, 838 F.2d 551, 556–58 (D.C.Cir.1988).

Applying these standards of review, we turn first to AT&T's allegation that the FCC acted in an arbitrary and capricious manner in adopting the new RIC. Then we examine CompTel's claim that it was arbitrary and capricious of the Commission to establish the initial TST–S rate based in part upon the overhead assigned to switched access while pricing DTT service on the basis of the lower overhead assigned to special access. Finally we turn to CompTel's separate objection to the FCC's approval of rates for DS3 and DS1 transport in a ratio that corresponds to the prices charged for comparable special access lines.

### A.  The Residual Interconnection Charge

■  AT&T embraces the straightforward position adopted by the Commission in 1992: "tandem-switched transport users should be required to pay for the tandem features and functions they use." *First Report and Order*, 7 FCC Rcd. at 7018. Otherwise, "the rate structure would encourage more tandem use than would be economically efficient," *id.*, thereby imposing a higher cost upon consumers. Rates for tandem switching that do not reflect the full cost of providing that service will discourage competitors with more efficient transport alternatives from entering the market. Indeed, observes AT&T, the Commission's rationale for abandoning the equal-charge rule was that "the benefit to consumers resulting from cost-based pricing and competition would be close to $1 billion annually." *Id.* at 7016.

The interim structure adopted by the Commission in 1992 requires tandem switch users to pay just 20% of the cost assigned to the TST–S component under the Part 69 regulations; the remaining 80% is assessed,

through the RIC, against all IXC carriers on an equal per-minute basis, without regard to the individual carrier's usage of tandem switching facilities. The FCC offered two explanations for this rate structure, neither of which, according to AT&T, satisfies the requirement of reasoned decisionmaking: First, as we have seen, the Commission did not want to "endanger the availability of pluralistic supply in the interexchange market." *Id.* at 7008. Second, it wanted the LECs to have additional time in which to prepare for fully cost-based rates. *Third Reconsideration Order,* 10 FCC Rcd. at 3048.

With respect to the "pluralistic supply" rationale, AT&T contends that four years after initiating its local transport proceeding, the Commission can point to no evidence, and has made no finding, that cost-based rates would impair competition. Moreover, declares AT&T, even if the FCC had determined that some smaller IXCs would not have survived if they had to pay cost-based rates, that showing would not justify the interim pricing structure. The failure of inefficient firms is to be expected in a competitive market, not deplored as a sign that the market has failed. The test of a competitive market is whether consumers are offered the lowest possible prices or more or better services. *See* Douglas H. Ginsburg, *Nonprice Competition,* 38 Antitrust Bulletin 83, 94 (1993). As the Commission itself once put it, the goal of the agency "is to promote competition in the interexchange marketplace, not to protect competitors." *Report and Order, WATS–Related and Other Amendments of Part 69 of the Commission's Rules,* 59 Rad. Reg.2d (P&F) 1418, 1434–35 (1986).

Responding to the Commission's argument that the smaller IXCs needed a transition period in order to adapt to full-cost pricing, AT&T points out that they were initially given eight years to adjust—from the promulgation of the Part 69 rules in 1983 to the scheduled expiration of the MFJ provision in 1991. Then in 1991, the FCC extended the equal-charge rule in order to afford IXCs yet another year of transition, followed by the "interim" rate structure—of indefinite duration—for the same purpose. In AT&T's

view, the Commission must now act upon what it acknowledged in 1983: "except in certain circumstances involving market failure, prices equal to the cost of producing another increment of a good, *i.e.,* equal to the marginal cost of production, are optimal." *1983 Access Order,* 93 F.C.C.2d 241 at ¶ 27. In that same order the Commission said that "a more lengthy transition [*i.e.,* beyond the 1991 termination date as inspired by the MFJ] would unnecessarily delay the advantages of cost-based rates." *Id.* at ¶ 175. Now, still in "transition" after 13 years, the Commission insists that even more time is needed. As AT&T is quick to observe, however, the Commission has not identified any change in the market to explain why something more than eight years of transition was necessary.

The Commission reiterates that the combined revenues from DTT and TST–T charges recover less than half of the estimated cost of service for switched access local transport. The remaining costs—initially assigned to the TST–S component, then 80% reassigned through the RIC—partly reflect tandem switching charges, and may in part reflect an excessive allocation of costs to interstate rather than intrastate services under the FCC's Part 36 rules; in any event, they are real costs that would not otherwise be recovered. In its *First Report and Order,* the Commission concluded that none of the allocation theories that had been proposed as of 1992 was sufficiently well-documented to assign the residual cost accurately and reliably. 7 FCC Rcd. at 7063–66.

The Commission claims that it could have gone even further and allocated all of this residual cost to the RIC—which would have been the economic equivalent of retaining the equal-charge rule—without impeding the development of competition for LECs in the local transport market. That is surely incorrect, however, for at least two reasons. First, Centralized Equal Access providers (like intervenor MIEAC) might be dissuaded from competing with LECs offering subsidized tandem-switched lines. Second, and more certain, the attempt to recover costs from IXCs that did not cause those costs to be incurred would impart the wrong incen-

tives to both actual and potential providers of local transport, thereby inducing them to offer an inefficient mix of dedicated, DTT, and tandem-switched service. That is why the FCC acknowledged that the equal-charge approach discouraged IXCs from demanding the least-cost service options from their LEC transport suppliers. *Id.* at 7007. That is also a principal reason why the Commission adopted the interim tandem switching charge and reduced from 100% to 80% the allocation of residual cost to the RIC. *Id.* at 7009–10. In its brief, the FCC concludes that this compromise figure "appeared to be high enough to deter excessive and uneconomical usage of tandem switching and low enough to avoid any significant threat to the fullness of competition in the interexchange market." The Commission offers no substantiation, however, for its conclusion.

The FCC insists that it simply could not have effectuated a cost-based structure because it did not have the information necessary to determine "cost causational" rates. The Commission did not, however, explain why after so many years it still required more information before it could allocate cost properly, nor what additional information would suffice, nor why the 20%–80% split was more equitable than an equal charge, or than eliminating the RIC altogether, or than something in between.

The explanation offered by the FCC is that it did not have "sufficient information to segregate tandem switching costs from the residual costs in a precise manner"; and that the Part 69 rules almost certainly result in an overstatement of the cost of providing tandem switching. Therefore, the Commission "proceeded with caution" in order to "minimize rate shock for customers," and "selected an interim charge at the low end of the range of possibilities" in order to "impose the least burden upon the smallest competitors." The Commission does not say, however, why easing the burden upon "small" competitors— much less not-so-small competitors MCI and Sprint—is still necessary or desirable in light of the agency's goal, announced in 1983, of having cost-based rates. Nor are we told how the FCC arrived at the "range of possibilities," nor whether small competitors could

have been protected without going all the way to the "low end of the range."

More important, nothing about a range of possibilities appears in the FCC orders under review. The range appears to be no more than a *post hoc* rationalization dreamed up by appellate counsel. In its 1992 *First Report and Order, id.* at 7019, when the Commission should have taken the opportunity to explain its RIC scheme, and how it emerged from the "range of possibilities," the agency simply and frankly announced:

> In order to ease the impact of a rate structure change on small IXCs ... we propose that the tandem element initially recover only twenty percent of the current tandem revenue requirement, with the remainder of the revenue requirement recovered through the interconnection charge, and find such rate to be just and reasonable.

■ To be sure, the Commission also invited further comments regarding the proper level of a permanent TST–S charge, but it has yet to release its analysis of those comments and now urges us not to consider an issue that it has not finally decided. This course would permanently immunize the FCC from review of the "interim" TST–S rate and the RIC. The Commission can not expect to avoid judicial scrutiny so easily— especially when the "interim" is measured in years and follows almost a decade of "transition." Indeed, even an interim rule expected to be in place for only a brief time is subject to review, or agencies would be free to act unreasonably for that time. *See Union of Concerned Scientists v. Nuclear Regulatory Comm'n,* 711 F.2d 370, 379 (D.C.Cir.1983) ("So long as we can grant meaningful relief affecting the controversy that precipitated the litigation, we may, in the interest of sound judicial administration, afford that relief ... upon review of the interim rule"). The proper judicial response to an interim rule is not to abdicate responsibility but rather to review it with the understanding that the agency may reasonably limit its commitment of resources to refining a rule with a short life expectancy.

For its part, AT&T contends that the allocation of 20% of the residual cost to the

tandem switch produces TST–S rates considerably below what a cost-based rate would be. CompTel argues that, on the contrary, the 20% apportionment consists principally of misallocated overhead and actually exceeds the full cost of the tandem switch. The Commission responds with its compromise, which is concededly not cost-based—indeed, it is not even based upon information in the record or supported by more than a conclusory statement of policy.

We are forced to conclude that the Commission has not justified the current RIC, in which 80% of the allocated cost of tandem switching are recovered from all IXCs—both tandem switch and dedicated users—upon the basis of their usage. When initially adopted in 1992 after a nine-year period of transition following the breakup of AT&T, the RIC was put forth as an interim device designed to facilitate the move from the equal charge rule then still in effect to a cost-based rate design. At that time, the RIC may have been a defensible compromise of two potentially conflicting objectives: encouraging an optimal mix of dedicated and common transport, and protecting smaller IXCs disadvantaged by the physical integration of AT&T and its former operating companies. Faced with considerable uncertainty about the cost properly allocable to the various transport components, the Commission apparently decided not to risk erring in a manner that might cause irreparable harm by driving smaller IXCs out of business. We need not decide, however, the question whether the interim Part 69 Rules were reasonable when adopted in 1992. The interim period has long since expired with no discernible progress by the FCC toward the determination of actual tandem switch cost. We conclude, therefore, that the circumstances that may have justified the Commission's action in 1992 do not justify its continued inaction in 1994, much less in 1996.

Accordingly, we grant AT&T's petition for review. The Commission is instructed to move expeditiously upon remand to a cost-based alternative to the RIC, or to provide a reasoned explanation of why a departure from cost-based ratemaking is necessary and desirable in this context.

### B. The Allocation of Common Transport Overhead

■ In its *First Report and Order* the FCC noted its "preference for setting initial rates with uniform overhead loadings in proportion to direct costs." 7 FCC Rcd. at 7030 n.91. CompTel complains, however, that in the interim rate structure the Commission departed from this expressed preference without giving a rational explanation for doing so. According to the petitioner, the FCC disregarded data showing that TST–S rates within a five-state region incorporate overhead loadings ranging from 2.5 to 5 times direct cost. Furthermore, CompTel claims that the Commission unreasonably adopted switched access overhead rates for the TST–S component of local transport while using lower special access overhead rates for TST–T and DTT services, and then attempted to counterbalance the excessive allocation of overhead to TST–S by arbitrarily re-assigning 80% of that allocation through the new RIC.

In an earlier proceeding the FCC had based its pricing of another switching function, Open Network Architecture (ONA), upon incremental cost. *See, e.g., Amendments of Part 69,* 8 FCC Rcd. 3114 (1993). CompTel urges the Commission to adopt the incremental cost approach here as well. The Commission distinguishes the earlier from the present proceeding on the ground that ONA involves enhanced services, the costs of which are merely a supplement to the cost of providing the primary service (end office switching) that in turn absorbs the overhead. Local transport is itself a primary service, and tandem switching is an independent means of local transport—an alternative to, but not a feature of, other switching functions and other methods of transport. CompTel replies that the Commission adopted incremental pricing for ONA not because it is an enhanced service but because it is an economically efficient pricing methodology. According to CompTel, there are no differences between the FCC's policy goals for ONA on the one hand and for tandem-switched local transport on the other that

could justify the agency's choice of different pricing methods for the two functions.

We accept the Commission's explanation for its rejection of CompTel's proposal that tandem switching be priced incrementally. For the Commission to explain why it rejected a particular method is not, however, at least in this context, to explain why it accepted an alternative method. The Commission still has not justified its use of the overhead allocated to switched access in order to establish the initial TST–S rate while pricing DTT service to include the lower overhead associated with special access. The substantial difficulty in identifying component costs, which may have prompted the FCC to fashion the admittedly crude compromise of 1992, is no longer an acceptable justification.

The resulting cost allocation to the tandem switch is, by the Commission's own estimation, grossly excessive. By pricing DTT service as it did the FCC first forced users of the tandem switch component to bear costs that, if assessed only against them, would have been prohibitive. Then, in order to protect smaller IXCs, the Commission found it necessary to reassign 80% of those costs through the RIC. ("O what a tangled web we weave, when first we practise"—dare we say, "to relieve"?)

Because the initial determination of total TST–S cost is inextricably linked to the level of the RIC, which the Commission will be revisiting in accordance with our instructions in Part II.A above, and because the Commission has neither implemented cost-based DTT rates nor explained why it has failed to do so, we grant CompTel's petition for review of the Commission's method for assigning overhead to the tandem switch component. Upon remand, if DTT pricing is to be based upon the overhead assigned to special access, then it should be because the FCC has made a reasoned determination that that method comes closest to replicating a cost-based rate. Similarly, the overhead assigned to the tandem switch component must be supported upon the basis of cost, not justified as a means by which smaller competitors can be subsidized. Alternatively, if the FCC determines not to pursue its announced goal of a cost-based system, then it must provide a reasoned explanation for its change of course.

## C. Ratio of DS3 to DS1 Rates

The Commission decided that initial DS1 and DS3 local transport rates would be deemed reasonable if based upon the DS1 and DS3 special access rates that were already in effect, *Third Reconsideration Order*, 10 FCC Rcd. at 3049, and that changes to the DS1 and DS3 rates for both special access and local transport would be made pursuant to the FCC's price cap rules, *First Report and Order*, 7 FCC Rcd. at 7043. An LEC's special access rate for DS3 service could not be less than 9.6 times its rate for DS1 service, however, unless the LEC could provide special cost justification for a lower ratio. *Id.*

When asked at oral argument to explain how the 9.6 minimum was determined, counsel for the Commission stated that the ratio of the DS3 to the DS1 rates contained in the special access tariffs that the Commission examined seemed to cluster in the range from 9.6 to 14; the Commission selected the lower end of that range knowing it was not necessarily cost-based but also knowing that higher ratios were probably not cost-based either. When pressed for an explanation, counsel reiterated that "[t]he Commission rejected the proposition that a higher ratio was necessarily the cost-based ratio because the showing that was made was simply not a persuasive showing." Counsel for the LEC Intervenors volunteered that Competitive Access Providers were offering DS3 service at a price as little as six times the price of DS1 service; the FCC would be justified in allowing a minimum ratio of 9.6 in order to discourage AT&T from buying DS3 service exclusively from CAPs, thereby gaining an even larger competitive advantage over other IXCs.

CompTel protests both the initial rate and the application of the price cap rules. With respect to the initial rate, CompTel argues that the special access ratios reflect "market pricing," *i.e.,* allocating a disproportionately high share of overhead to lower capacity DS1 service, where the LECs retain

monopoly power, while allocating lower cost to high capacity DS3 service, which faces competition from special access and dedicated transport. CompTel asserts that a proper cost-based ratio would be in the neighborhood of 24 to 1, reflecting the difference in capacity between the DS3 and DS1 lines, adjusted for the cost of the 3:1 multiplexer that is required for DS1 service. Any LEC seeking a ratio lower than 24 to 1 should, according to CompTel, have to show a special cost justification.

Indeed, CompTel reminds us that the Commission, in *Local Exchange Carriers' Rates, Terms, and Conditions for Expanded Interconnection,* 10 FCC Rcd. 6375 (1995), rejected market pricing altogether. There, the FCC established rates for services similar to local transport but applicable only when an IXC or a CAP builds a facility physically contiguous to an existing LEC end office. The Commission "restrict[ed] the ability of the LECs to assign overheads based on market conditions," and stated that "competition depends on the ability of competitors to purchase LEC facilities at rates that reflect economic costs." *Id.* at 6404. The FCC ordered the LECs to eliminate all disparities, no matter how small, in overhead loadings. *Id.* at App. C. CompTel asks why market pricing should be unacceptable in the context of *Expanded Interconnection* but unobjectionable for the purpose of pricing DTT transport. The petitioner observes that in this case the disparities between the DS3 and DS1 loading factors, which range from 0.6 to 2.4, are far greater than the disparities that the Commission found unacceptable in the *Expanded Interconnection* proceeding.

The FCC relied upon its price cap rules to constrain these disparities; under those rules LECs can make only gradual changes to their current DS3 to DS1 rate relationship. *Second Report and Order,* 9 FCC Rcd. at 625–26. CompTel regards this reliance as misplaced: limitations upon the percentage changes in DS1 and DS3 rates cannot over time resolve the inherent incompatibility between market pricing and a cost-based rate structure. First, the price caps apply to initial rates that were not properly determined at the outset. Second, price caps may

shift overhead so as to widen the disparity between DS1 and DS3 rates. In fact, Sprint had contended in its petition for reconsideration of the *Second Report and Order* that, within a three-year period under the price cap rules DS3 rates could fall by as much as 27% while DS1 rates increase by 16%, thereby reducing a starting ratio of 9.6 to 1 to a mere 6 to 1. The answer, in CompTel's view, is to establish a uniform cost-based initial ratio and adjust the price cap rules in order to assure that the initial ratio is maintained over time.

In rejecting this very concept, the Commission argued that a uniform ratio could not fully reflect cost differences among LECs or, "as technology changes the relevant cost factors," over time. *Third Reconsideration Order,* 10 FCC Rcd. at 3059. The FCC says that it examined alternative formulations for initial DS3 and DS1 rates—including CompTel's proposal for a uniform ratio—but concluded that they were not cost-based. *See id.* at 3058–59. CompTel insists, however, that the Commission could have applied a "lowest common denominator" approach, using a conservative ratio of, say, 20 to 1, which would have accommodated "all potential cost differences," and would in any event have been preferable to having no fixed ratio at all—the very circumstance that permitted LECs to establish DS3-to-DS1 price ratios without regard to cost differentials. Alternatively, CompTel suggests that the Commission might have allowed for cost variations among LECs by prescribing a different loading factor for each LEC but requiring that it apply to both DS3 and DS1 overhead. This alternative—which was adopted by the Commission in the *Expanded Interconnection* proceedings—represents a step toward cost-based pricing; at the same time it forecloses market pricing as a device by which the LECs could discriminate among their IXC customers.

The FCC responds, first, by denying on several grounds that *Expanded Interconnection* controls the outcome of the present proceeding. Foremost among the FCC's reasons, and sufficient to carry the point, is the undeniable fact that the order in that proceeding was issued after the last of the or-

ders under review in this case; therefore the Commission could not have been under an obligation to explain in the earlier order any inconsistency with the later *Expanded Interconnection* order. *See MacLeod v. ICC,* 54 F.3d 888, 892 (D.C.Cir.1995) (court will not reach out to examine decision made after one under review).

Second, the Commission explains why it used the special access rates to establish the initial overhead loading factors for DS3 and DS1 services. When a new tariff is filed, the Commission conducts an internal review in order to determine whether the rate should be rejected as unlawful, investigated pursuant to § 204(a)(1) of the Communications Act, 47 U.S.C. § 204(a)(1), or accepted. The special access rates had already passed Commission scrutiny and been accepted; they were known to comply with applicable standards for rate-of-return regulation. *See Policy and Rules Concerning Rates for Dominant Carriers, Second Report and Order,* 5 FCC Rcd. 6786, 6814 (1990). In the FCC's view, the agency is not required to demonstrate anew that the DS3-to-DS1 overhead relationship for switched access, which was derived from the corresponding relationship for special access, is lawful—even if the underlying special access filing was not formally investigated by the Commission. Faced with the perplexing problem of relating mostly fixed line cost to incremental capacity, the FCC opted—quite reasonably from its point of view—to start with the special access rates that it had already approved.

Third, the Commission argues that CompTel has not identified any special circumstance that would support a departure from its previously approved price cap rules. *See National Rural Telecom,* 988 F.2d at 182–83. CompTel's proposal to freeze the rate relationship between DS1 and DS3 services would be a radical break not only with the current price cap rules, but also with the rules that were used before price caps went into effect (whereby rate changes were based upon cost and demand projections that the carriers were required to file each year). The Commission asserts that it can best address the singular problems posed by local transport without imposing a remedy so rigid

that it precludes all pricing flexibility. Indeed, the FCC has already modified its price cap rules by creating new service baskets and establishing varied band limits for annual changes in rates for DTT—thereby constraining the disparity between DS3 and DS1 loading factors. *Second Report and Order,* 9 FCC Rcd. at 622–32.

Finally, the LEC Intervenors, in support of the Commission, claim that CompTel errs in assuming that a cost ratio of 28 to 1—or even its "conservative" 20-to-1 ratio—is appropriate simply because a DS3 line has 28 times the capacity of a DS1 line. The transmission capacity of optical fiber is elastic, according to the Intervenors; there is no direct relationship between the number of channels and the cost of a line. In some circumstances, adding a channel to a preexisting line can be virtually cost-free. Therefore, the cost of a single DS1 channel and of a single DS3 channel along a fiber route could be almost identical, according to the Intervenors, and a1-to-1 ratio might even be more accurate than a 20-to-1 ratio. That may help to explain why several LECs had priced DS3 service at less than the 9.6 multiple of DS1 that the Commission ultimately decided is the low end of the "zone of reasonableness."

Weighing the various arguments, we agree with the Commission that imposing a fixed ratio of DS3 to DS1 rates might "erect a non-cost-based price umbrella, similar to the equal charge rule, and hamper access competition." *Third Reconsideration Order,* 10 FCC Rcd. at 3058. The Commission's use of special access relationships in order to establish initial DS3 and DS1 rates, and its adaptation of the price cap rules for the purpose of facilitating periodic rate revisions, are both reasonable in view of "the LECs' need for some pricing flexibility in the face of increased competition," *id.* at 3062, and the difficulty of determining the cost associated with incremental line capacity. We cannot say that the Commission's rejection of CompTel's alternatives and its continuation of past practices, as modified to fit new circumstances, is a clear error of judgment or arbitrary or capricious. While the 9.6-to-1 minimum ratio may rest upon a shaky empirical

foundation, no petitioner has asked us to upset only that one aspect of the relationship between DS3 and DS1 rates that is the subject of CompTel's petition for review.

### III. Summary and Conclusions

We grant AT&T's petition for review of the RIC; the Commission acted in an arbitrary and capricious manner by creating the new interconnection charge to recover 80% of the cost allocated to tandem switching. The RIC was admittedly not cost-based and the Commission did not give a reasoned explanation why its adoption was necessary or appropriate and consistent with the agency's statutory responsibilities. Upon remand the Commission must implement a cost-based TST–S rate or offer a rational and non-conclusory analysis in support of its determination that an alternative structure is preferable.

We grant CompTel's petition for review with respect to the Commission's method of assigning overhead to the tandem switch component. Only because it had allocated what the Commission itself regarded as excessive overhead to the tandem switch did the agency reallocate 80% of that cost through the RIC. The difficulty in identifying component costs, which apparently prompted this crude compromise, is after 13 years no longer a persuasive rationale for this meat axe approach to what should be close work. On remand, therefore, the Commission must substantiate that its current method of allocating overhead is cost-based, or choose a method that is. Alternatively, if the FCC determines not to pursue its announced goal of a cost-based system, then it must provide a reasoned explanation for that change of course.

We deny CompTel's petition for review of the ratio of DS3 rates to DS1 rates. In using the allocation of overhead for special access to establish initial rates for DS3 and DS1 transport, and in relying upon the price cap rules to facilitate periodic rate revisions, the Commission reasonably weighed both the LECs' need for pricing flexibility and its own difficulty in determining the cost associated with added line capacity. To the extent that the Commission's solution departs from cost-based pricing, the departure is consistent with past practice and the Commission offered a reasoned explanation for it. The FCC's rejection of CompTel's fixed ratio alternative is neither a clear error in judgment nor arbitrary or capricious.

The petitions are granted and denied as indicated in, and this matter is remanded to the FCC for further proceedings consistent with, the foregoing opinion.

*So ordered.*