**SOUTHWESTERN BELL TELEPHONE COMPANY, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**MFS Communications Company, Inc., et al., Intervenors.**

Nos. 93–1779, 97–1468.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 7, 1999.

Decided March 19, 1999.

---

1346

Michael J. Zpevak argued the cause for petitioners. On the briefs were James D. Ellis, Robert M. Lynch, Durward D. Dupre, Darryl Howard, and Jeffrey B. Thomas. Nancy C. Woolf and Thomas A. Pajda entered appearances.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson, and Robert J. Wiggers, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, Daniel M. Armstrong, Associate General Counsel, and Laurel R. Bergold, Counsel.

Russell M. Blau argued the cause for intervenors Association for Local Telecommunications Services, et al. With him on the brief were Andrew D. Lipman, Robert V. Zener, Frank W. Krogh, Mark Ehrlich, Peter D. Keisler, Peter H. Jacoby, Richard J. Metzger, and Craig Joyce. Mark C. Rosenblum entered an appearance.

Robert B. McKenna was on the statement in lieu of brief for intervenor US West Communications.

Before: SILBERMAN, SENTELLE and RANDOLPH, Circuit Judges.

SENTELLE, Circuit Judge:

Southwestern Bell Telephone Company and other local telephone companies (collectively "Southwestern Bell") petition for review of orders issued by the Federal Communications Commission ("FCC" or "Commission") regulating the rates of local exchange carriers ("LECs") for physical collocation service. The FCC suspended a portion of the rates attributable to overhead loadings for a five-month period, pending investigation. Before the suspension period ended, the FCC issued an "interim prescription" of maximum overhead loading factors while it continued its investigation. At the end of the investigation, the FCC disallowed costs which it determined Southwestern Bell had not adequately supported to the extent that the costs exceeded one standard deviation above the industry-wide average.

Southwestern Bell challenges (1) the authority of the FCC to issue an interim prescription of rates, (2) the industry-wide average methodology employed by the FCC, and (3) the FCC's disallowance of certain direct costs. We hold that Southwestern Bell's claim that the FCC exceeded its statutory authority by issuing an interim prescription is moot. We further hold that the FCC's use of the industry-wide average methodology and disallowance of certain direct costs were within its discretion. As a result, we deny Southwestern Bell's petition for review.

## I. BACKGROUND

The present controversy arises from the FCC's ongoing effort to expand competition among providers of access for long-distance telecommunications. Long-distance phone companies, interexchange carriers ("IXCs"), must obtain access to local telephone customers in order to sell their services. An IXC connects to its long-distance customers by using either special access or switched access facilities. *See generally Competitive Telecommunications Ass'n v. FCC*, 87 F.3d 522 (D.C.Cir.1996). Switched access involves transmission of calls from the local customers' premises through the switching center or "central offices" of an LEC to the facilities of an IXC, thence through the IXC's facilities to the central offices of another LEC for delivery to the called party. Special access removes the switching aspect from the commencement of the process by the provision of a dedicated line running directly from the customer to the facility of the IXC. *See id.* at 524. The LECs for many years had the local access market largely to themselves. During the 1980's, assisted by technological breakthroughs, a growing number of competitive access providers ("CAPs") entered the special access market, particularly in large urban areas. Special access tariffs of the dominant LECs limited the ability of the CAPs to compete in the provision of facilities for special access. *See Bell Atlantic Tel. Cos. v. FCC*, 24 F.3d 1441 (D.C.Cir.1994).

In an effort to reduce these barriers to competition, the Commission in 1992 adopted the "expanded interconnection rules" requiring most major LECs to provide either physical collocation, in which the LEC provides central office space for the CAP to place and use its own equipment, or virtual collocation, in which the interconnecting CAP has the right to designate or specify LEC equipment dedicated to its use. With modifications responsive to an order of this court vacating requirements of the original order, *Bell Atlantic v. FCC*, 24 F.3d 1441 (D.C.Cir.1994), the Commission's basic requirements continue. Expanded Interconnection with Local Telephone Facilities, 9 FCC Rcd 5154 (1994) (virtual collocation order), *remanded, Pacific Bell v. FCC*, 81 F.3d 1147 (D.C.Cir.1996). Under the Commission's rules, the LECs are required to file tariffs with unbundled rate elements designed to recover the reasonable cost of providing the required interconnection services. Expanded Interconnection with Local Telephone Company Facilities, 7 FCC Rcd 7369, 7372, 7421–47, *reconsidered,* 8 FCC Rcd 127 (1992), *reconsidered,* 8 FCC Rcd 7341 (1993), *vacated in part and remanded, Bell Atlantic Tel. Cos. v. FCC*, 24 F.3d 1441 (D.C.Cir.1994).

On February 16, 1993, sixteen LECs filed the special access expanded interconnection tariffs at issue in this case. After reviewing the LECs' submissions, on June 9, 1993, the Common Carrier Bureau (the "Bureau") of the FCC issued its "Physical Collocation Tar-

1348

iff Suspension Order." *See* In the Matter of Expanded Interconnection with Local Telephone Facilities, CC Docket No. 93–162, 8 FCC Rcd 4589 (1993) ("Physical Collocation Tariff Suspension Order") (Joint Appendix ("J.A.") at 424). That order advanced the effective date of the tariffs by one day, suspended the tariffs in their entirety for one day, then allowed them to take effect subject to an accounting order and a modification that had the effect of reducing the rates in the tariffs for the period of an ensuing investigation, based upon the Bureau's preliminary judgment that the petitioners had not adequately justified overhead loadings. Thus, the Bureau substituted its own overhead costing methodology and its reformulation of rates for those of the LECs, and permitted its rates, not the rates filed in the tariffs, to become effective subject to the accounting and refund provisions of the tariff suspension order.

On July 9, 1993, Southwestern Bell and the other LECs filed an application for review of the Bureau order. After considering submissions from the LECs, the FCC issued its "First Report and Order" finding that the LECs had failed to demonstrate that their proposed overhead loading factors were just and reasonable. In the Matter of Local Exchange Carriers' Rates, Terms and Conditions for Expanded Interconnection for Special Access, CC Docket No. 93–162, 8 FCC Rcd 8344, ¶¶ 2, 26 (1993) ("First Report and Order") (J.A. at 37–38, 48). The FCC concluded that the record before it was not adequate to permit a permanent rate prescription. However, it determined that the "public interest" required it to take immediate action to ensure the availability of expanded interconnection at rates that were based upon verifiable and reasonable overhead loading factors while it continued its investigation. *Id.* ¶ 35 (J.A. at 52). The "immediate action" the FCC chose to take involved issuance of an "interim prescription" of rates that would remain in effect pending the outcome of its investigation. *Id.* ¶¶ 35, 36, 38 (J.A. at 52–54).

The FCC made its interim prescription subject to a two-way adjustment mechanism: carrier recoupment if the FCC found at the end of the investigation that the interim rates were below a just and reasonable level, and refunds to customers if the FCC finally concluded that the interim rates were too high. *Id.* ¶ 39 (J.A. at 54). As authority for its issuance of the interim prescription, the FCC cited 47 U.S.C. §§ 154(i), 201, and 205. *Id.* ¶ 37 (J.A. at 53). Contending that the FCC had exceeded its statutory authority, Southwestern Bell filed a petition for review of the First Report and Order with this court on November 22, 1993. On January 12, 1994, the FCC filed a motion to hold the appeal in abeyance, which this court granted on March 14, 1994.

After a four-year investigation during which the FCC's "interim" prescription remained in effect, the FCC issued its "Second Report and Order," finding that the LECs had failed to establish the reasonableness of the rates, terms and conditions in their expanded interconnection tariffs. In the Matter of Local Exchange Carriers' Rates, Terms, and Conditions for Expanded Interconnection Through Physical Collocation for Special Access and Switched Transport, CC Docket No. 93–162, 12 FCC Rcd 18730, ¶ 4 (1997) ("Second Report and Order") (J.A. at 79). The FCC disallowed certain direct costs for physical collocation services, prescribed maximum permissible overhead loading factors, ordered tariff revisions to correct unreasonable rate structures, and struck down certain tariff provisions on the grounds that they were unjust, unreasonable, discriminatory, and anticompetitive. The FCC affirmed the Bureau's partial suspension of the expanded interconnection rates as well as its own interim prescription of rates. *Id.* ¶¶ 413–20 (J.A. at 242–46). As authority for the partial suspension, the Commission relied on Section 204(a), which authorized it to suspend a rate "in whole or in part." *Id.* ¶ 415 (quoting 47 U.S.C. § 204(a)) (J.A. at 244). Again, the FCC noted that its partial suspension fulfilled the goal of ensuring the availability of expanded interconnection during the suspension period at rates that did not reflect the legally suspect overhead loadings. *Id.* ¶ 416 (J.A. at 244).

Similarly, the FCC affirmed the interim prescription it adopted in its First Report and Order. *Id.* ¶¶ 404–10 (J.A. at 238–41).

In doing so it cited this court's decision in *Lincoln Telephone & Telegraph Co. v. FCC,* 659 F.2d 1092 (D.C.Cir.1981), claiming that our holding in that case justified an interim rate prescription accompanied by a two-way adjustment mechanism under Section 4(i). *Id.* ¶ 404 (J.A. at 238–39). The Commission rejected the LECs' objection that it had issued its interim prescription without an opportunity for hearing. *Id.* ¶ 408 (J.A. at 240–41). The Commission further found that the interim prescription it had imposed was just and reasonable. *Id.*

Having determined that it had authority to issue an interim prescription, the FCC proceeded to analyze the LECs' direct cost justifications on a case-by-case basis, making disallowances where it believed an improper cost methodology had been used. *Id.* ¶ 67 (J.A. at 108). For example, the FCC disallowed Pacific Bell's floor space costs to the extent that they included a 30–foot "access area" outside the collocator's enclosed physical collocation space, reasoning that the "common space" was not a direct cost of physical collocation service. *Id.* ¶ 96 (J.A. at 119–20). The Commission also compared the direct costs among LECs on a "function-by-function" basis by developing industry-wide average direct costs for each function associated with the provision of physical collocation. *Id.* ¶¶ 124–25, 170 (J.A. at 131–32, 151). The FCC then calculated one standard deviation from the average. If an LEC's direct costs for a particular function exceeded one standard deviation from the industry-wide average, the FCC scrutinized the LEC's cost data and other potential justifications for the LEC's high direct costs for that function to ascertain whether the costs were reasonable. *Id.* ¶¶ 125, 170 (J.A. at 131–32, 151–52). The Commission decided upon this particular methodology after concluding that the use of industry-wide averages to prescribe physical collocation rates was within its discretion in selecting appropriate ratemaking methods. *Id.* ¶¶ 144–49 (J.A. at 138–42).

## II. ANALYSIS

### A. *The Interim Prescription*

#### 1. *The LECs' Challenge*

At issue in this case is whether the FCC's novel "interim prescription" fits within the statutory framework governing its authority, or whether the FCC has arrogated to itself new power that it is not authorized to exercise under the Communications Act. The Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (the "Act"), provides the FCC statutory authority to review rates charged for interstate common carrier communications services to assure that the rates are just and reasonable. 47 U.S.C. § 201(b). Section 204(a)(1) of the Act gives the FCC authority to investigate filed rates and to suspend the effectiveness of those rates, "in whole or in part," while the investigation is pending, but not for longer than five months. *Id.* § 204(a)(1). After full hearing, the FCC may issue any order that would be proper in a proceeding initiated after the rates had become effective. *Id.*

A separate section of the Act, 47 U.S.C. § 205, empowers the Commission to deal with rates or practices of carriers that it finds to be in violation of the Act. When acting under Section 205, the Commission is empowered to "determine and prescribe ... just and reasonable" rates for the performance of the affected services. Section 205 proceedings begin with a complaint or order for investigation and require a full opportunity for hearing. Under Section 201, the Commission is authorized to order the common carrier to physically connect with other carriers and to set "charges applicable thereto." 47 U.S.C. § 201. Finally, 47 U.S.C. § 154(i) provides a general power to the Commission to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." Southwestern Bell makes a powerful case that the Commission's interim prescription exceeds its authority under this statutory scheme.

The statutory language at issue here is straightforward and clear. Congress has directly spoken to the FCC's authority to prescribe rates in various provisions of the Communications Act. The FCC relies on Sections 204, 205, and 154(i) as authority for its interim prescription of rates. It contends

that Section 204's provision of authority to suspend rates "in whole or in part" allows it to prescribe rates by suspending parts of the rates that it finds potentially objectionable. It further cites the Act's "necessary and proper" clause embodied in 47 U.S.C. § 154(i) as an independent source of authority for its interim prescription of rates that is "ancillary" to its authority to prescribe rates pursuant to Section 205. Having considered the agency's arguments, we have strong doubts that the FCC acted within its statutory authority when it issued the interim prescription.

Section 204(a) gives the Commission the authority to approve or suspend a proposed charge that is part of an overall tariff filing in its entirety, or to approve or suspend some elements of a list of proposed tariff charges, but not to initiate an entirely new charge for a proposed service outside of the four corners of the carrier's tariff filing, while labeling its interim prescription as a "partial suspension." "[It] is the actual impact of the FCC's actions, rather than the language it uses, which determines whether or not the FCC has 'prescribed' tariffs or other conditions under the statute." *MCI Telecommunications Corp. v. FCC*, 627 F.2d 322, 337 (D.C.Cir.1980); *see also Nader v. FCC*, 520 F.2d 182, 202 (D.C.Cir.1975) (concluding that the FCC's setting of a specific rate of return different than that which the carrier used to formulate its tariff rates was an implicit prescription of permissible charges); *American Tel. & Tel. Co. v. FCC*, 487 F.2d 865, 874 (2d Cir.1973) (concluding that the FCC's denial of permission to file a tariff revising charges for an interstate service had the same effect as a Section 205 rate prescription).

The LECs argue that the Commission may engage in rate prescription only under Section 205 and only after a "full opportunity for hearing" and a determination that the rates, terms, and conditions are just and reasonable. 47 U.S.C. §§ 205(a), 201; *see also American Tel. & Tel.*, 487 F.2d at 873 ("Sections 203 through 205 of the Act ... establish precise procedures and limitations concerning the Commission's processing of carrier initiated rate revisions.").

They further argue that the FCC's reliance upon Section 154(i) is unavailing. Section 154(i) provides the Commission no independent substantive authority; it merely provides that the Commission may issue orders that are necessary in the execution of its functions as described under other provisions of the Act, while not contravening any other provisions. Under Section 205, the FCC may prescribe rates only after a hearing and a determination that the prescribed rates are just and reasonable. The FCC has not satisfied those statutory requirements in this case. Under these circumstances, an interim prescription under Section 154(i) would "defeat the purpose of Section 205 and vitiate the specific statutory scheme." *American Tel. & Tel.*, 487 F.2d at 875.

Appealing as Southwestern Bell's logic may seem, we cannot act unless the case is properly before us. That is, we must first determine whether we have jurisdiction to review the disputed agency action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 1020, 140 L.Ed.2d 210 (1998).

### 2. Jurisdiction

Those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold case or controversy requirement imposed by Article III of the Constitution. *Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). They must demonstrate a "personal stake in the outcome" of the case in order to "assure that concrete adverseness which sharpens the presentation of [the] issues" to be decided by the tribunal. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Where an action has no continuing adverse impact and there is no effective relief that a court may grant, any request for judicial review of the action is moot. *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). As the Court noted in *O'Shea*, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy ... if unaccompanied by any continuing, present adverse effects." *Id.* at 495–96, 94 S.Ct. 669.

■ There is, however, an "exception" to the general mootness doctrine where a challenged action is "capable of repetition, yet evading review." *Steel Co.*, 118 S.Ct. at 1020; *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (noting that consideration of agency orders "ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review"); *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349–51 (D.C.Cir.1997); *American Tel. & Tel.*, 487 F.2d at 881 n. 35.

Southwestern Bell's challenge to the FCC's lack of statutory authority in imposing the interim prescription appears moot. The suspension period and the FCC's corresponding interim prescription have expired since Southwestern Bell filed this suit. As a result, Southwestern Bell does not suffer any detrimental "continuing, present adverse effects," *O'Shea*, 414 U.S. at 495–96, 94 S.Ct. 669, from the FCC's imposition of an interim prescription. Moreover, because the interim prescription is no longer in effect, this court can grant Southwestern Bell no relief other than declaring that the procedures employed by the FCC were unlawful. Thus, Southwestern Bell's claim lacks two of the elements necessary for our assertion of jurisdiction—redressibility and a present, continuing injury-in-fact.

Before making a final determination, however, we must also consider whether the FCC's interim prescription is the sort of agency action that falls within the exception to the mootness doctrine for conduct that is "capable of repetition, yet evading review." The FCC acknowledges that there have been cases in the past where it has employed a similar procedure. *See, e.g., In the Matter of Lincoln Tel. & Tel.'s Duty to Furnish Interconnection Facilities*, 72 FCC2d 724 (1979), *aff'd, Lincoln Tel. & Tel. Co. v. FCC*, 659 F.2d 1092 (D.C.Cir.1981); *Western Union Tel. Co.*, FCC 79–812 (1979), *aff'd, FTC Communications, Inc. v. FCC*, 750 F.2d 226, 231–32 (2d Cir.1984). Indeed, given the important policy goals the FCC cites in support of its use of the interim prescription, it is possible that the agency will attempt to impose this novel mechanism upon other carriers in the future. Thus, on its face, the FCC's interim prescription appears to be the sort of agency action that is capable of repetition, yet evading review, thereby falling within the exception to the mootness doctrine.

■ Nonetheless, the Supreme Court has made clear that in order to fall within this exception, a named plaintiff must make a reasonable showing that it will again suffer injury as a result of the alleged illegality. *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality."); *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). It is not enough that the challenged agency action might in the future be taken against some other party. Rather, the court must conclude that there has been a reasonable showing that the challenged agency action may be taken against the *same petitioners* sometime in the future.

We conclude that Southwestern Bell has failed to make the required showing that any of the petitioners will again be subject to the FCC's interim prescription procedure. The FCC imposed the interim prescription because physical interconnection was a new service with no set cost formula for rates and the agency concluded that the LECs had not provided sufficient data after being requested to do so. The FCC determined that it had enough information under the circumstances to find that the overhead loadings claimed by the LECs were unreasonable, but not enough to make a timely definitive finding on what would be reasonable. First Report and Order ¶¶ 34–35 (J.A. at 52). In the future, physical interconnection will no longer be a "new" service for these particular petitioners, making it unlikely that the FCC will again seek to impose upon them its novel interim prescription procedure for this service. Because petitioners have not alleged that the FCC will impose its novel procedure upon them for any other new service, we must conclude that the capable-of-repetition exception to the mootness doctrine does not apply. The challenge to the interim pre-

**1352**

scription is moot. We have no jurisdiction over that challenge.

### B. The FCC's Methodology

Having concluded that we do not have jurisdiction to review whether the FCC's interim prescription has exceeded its statutory authority, we proceed to Southwestern Bell's objections to the agency's ratemaking methodology. In particular, we must consider the FCC's (1) use of industry-wide averages in determining the reasonableness of rates and (2) disallowance of certain direct costs. The FCC argues that these challenges are not properly before the court, invoking Section 405 of the Communications Act, which bars judicial review of issues of law or fact on which the Commission "has been afforded no opportunity to pass." 47 U.S.C. § 405(a). On the present record, however, the agency had ample opportunity to address, and did indeed address, the objections raised by Southwestern Bell in its First and Second Orders. We therefore will proceed to consideration of the merits. *See Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C.Cir.1979) (noting that the exception to review under Section 405 should be "strictly construed"); *National Ass'n for Better Broad. v. FCC*, 830 F.2d 270, 274 (D.C.Cir.1987).

We review the FCC's actions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this deferential standard, we presume the validity of agency action. *Jersey Shore Broad. Corp. v. FCC*, 37 F.3d 1531, 1537 (D.C.Cir.1994). Moreover, because "agency ratemaking is far from an exact science and involves 'policy determinations in which the agency is acknowledged to have expertise,'" courts are "particularly deferential" when reviewing ratemaking orders. *Time Warner Entertainment Co. v. FCC*, 56 F.3d 151, 163 (D.C.Cir.1995) (quoting *United States v. FCC*, 707 F.2d 610, 618 (D.C.Cir.1983)). The FCC is accorded broad discretion in "selecting methods ... to make and oversee rates." *MCI Telecommunications Corp. v. FCC*, 675 F.2d 408, 413 (D.C.Cir.1982); *see also Aeronautical Radio,*

*Inc. v. FCC*, 642 F.2d 1221, 1228 (D.C.Cir. 1980) ("[T]he Commission has broad discretion in selecting methods for the exercise of its powers to make and oversee rates."); *ALLTEL Corp. v. FCC*, 838 F.2d 551, 557 (D.C.Cir.1988). As long as the Commission makes a "reasonable selection from the available alternatives," its selection of methods will be upheld "even if the court thinks [that] a different decision would have been more reasonable or desirable." *MCI*, 675 F.2d at 413. Applying these standards to the FCC's use of the industry-wide average methodology, we conclude that the FCC did not engage in arbitrary or capricious decisionmaking.

Southwestern Bell objects to the FCC's use of industry-wide cost averages on two grounds. First, it asserts that the use of industry-wide averages was arbitrary, capricious and contrary to law. According to Southwestern Bell, the FCC in implementing this approach failed to take into account differences in costing methodologies LECs used in calculating their costs as well as regional variations among costs, such as the costs of real property, office space, and labor. Second, it asserts that the FCC failed to comply with required notice and comment procedures in deciding to employ this approach. *See* 5 U.S.C. § 553; 47 U.S.C. § 205(a). Southwestern Bell complains that the Commission failed to give prior notice of its intention to prescribe rates based on industry-wide average direct costs and establish a presumption that direct costs in excess of one standard deviation above the industry average were unreasonable.

The use of industry-wide averages in setting rates is not novel. Indeed, the Supreme Court has affirmed ratemaking methodologies employing composite industry data or other averaging methods on more than one occasion. *See, e.g., FPC v. Texaco Inc.*, 417 U.S. 380, 387, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974) (noting that agency ratemaking does not "require that the cost of each company be ascertained and its rates fixed with respect to its own costs"); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 769, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The FCC adopted such an approach in this case based on its conclusion that the LECs generally use

the same assets and perform the same tasks in providing physical collocation service. Second Report and Order ¶ 131 (J.A. at 134). Nonetheless, it made "adjustments" and "modifications" to this general approach where costs varied widely among carriers. For example, the agency took into account differences in the way individual LECs provided physical collocation service and adjusted its average cost calculations to account for these differences. *Id.* ¶¶ 131–41 (J.A. at 134–37). Further, where an LEC's direct costs exceeded two standard deviations above the adjusted direct cost average, the Commission excluded those direct costs from the data it used to calculate the industry average. *Id.* ¶¶ 130, 158 (J.A. at 133, 145). As a result, we conclude that the FCC's use of this particular methodology was well within its discretion.

■ Similarly, we reject Southwestern Bell's contention that it was denied an opportunity to comment on the FCC's use of industry-wide averages in evaluating the reasonableness of the LECs' physical collocation rates. We conclude that the agency's use of industry-wide averages did not constitute use of "new criteria" that were not "foreshadowed in the rules the Commission had adopted to handle such issues." *Southwestern Bell Tel. Co. v. FCC*, 28 F.3d 165, 172 (D.C.Cir.1994). Rather, as already noted, the use of industry-wide averages is one commonly-employed technique in evaluating the reasonableness of rates charged by regulated entities. *Cf. In re Permian Basin Area Rate Cases*, 390 U.S. at 788–89, 88 S.Ct. 1344 (concluding that the Federal Power Commission did not err in failing to provide opportunities for comment on the size and boundaries of a regulatory area where there was no claim that it did not fit with prevailing industry practice or other programs of state or federal regulation). Indeed, the FCC noted in its Second Report and Order that it has used industry averages in the past to establish a rate of return for LECs' interstate access service, as well as for creating a productivity factor for price cap LECs. Second Report and Order ¶ 146 (J.A. at 140). Moreover, the FCC issued orders in this case foreshadowing its intention to evaluate the reasonableness of the LECs' rates in light of industry average costs. For example, the

Commission noted that overhead factors appeared to be a significant reason for "the high rates filed by certain companies in comparison with the industry average." Expanded Interconnection with Local Telephone Company Facilities, CC Docket No. 93–162, 8 FCC Rcd 4589, ¶ 31 (1993) (J.A. at 431). As a result, given the circumstances in this case, we cannot conclude that Southwestern Bell was unfairly deprived of notice that the FCC might employ such techniques in evaluating the reasonableness of the LECs' rates.

■ While the FCC's use of industry-wide averages is not objectionable, its use of a one-standard-deviation cutoff raises greater concerns. After calculating the industry-wide averages, the FCC scrutinized any costs exceeding one standard deviation above the industry-wide average in order to determine whether any explanation in the record supported the cost. The Commission then disallowed the cost if it found that it was not justified by the record evidence. The Commission generally disallowed costs to the extent they exceeded one standard deviation above the industry-wide cost average. Southwestern Bell objects to this aspect of the FCC's methodology, arguing that disallowing costs that exceed one standard deviation above the industry average, while at the same time making no adjustment for costs that exceed one standard deviation below the industry average, results in the prescription of rates that are less than the average, which it asserts is inconsistent with the FCC's goal of establishing rates based on the LECs' cost of service. It further argues that the choice of one standard deviation as the cutoff point was arbitrary. Again we conclude that this methodological choice falls within the FCC's discretion. The FCC has merely subjected costs exceeding industry-wide averages by at least one standard deviation to additional scrutiny, and has not established a *per se* rule of disallowance for such costs. While it is not perhaps the method this court would select were we choosing the FCC's methodology *de novo*, the FCC reasoned that this approach was appropriate given the need for flexibility in taking into account reasonable variations in the LECs' levels of efficiency in

1354

providing physical collocation service. Second Report and Order ¶¶ 147–49 (J.A. at 140–42). Therefore, we conclude that the agency did not abuse its discretion in employing the one-standard-deviation cutoff.

Finally, we conclude that the FCC did not err by disallowing certain direct costs Pacific Bell had incorporated in its rate base. The FCC concluded that Pacific Bell did not adequately justify including an additional 30 square feet of floor space for collocator access as a direct cost in light of the fact that the other LECs were able to satisfy their access obligations without providing for an additional 30 square feet. *Id.* ¶¶ 96–97 (J.A. at 119–20). After considering the evidence before it, the FCC concluded that the disputed access area was "common space" rather than space that was necessary for the interconnector to obtain access to its enclosed physical collocation space. The LECs assert that the Commission's disallowance of these costs was arbitrary and capricious and should be vacated because Pacific Bell presented evidence indicating that the access area was dedicated solely to physical collocation. After examining the record, we conclude that the FCC did not abuse its discretion in finding that Pacific Bell had not made an adequate showing that the claimed access area costs constituted a direct cost of physical collocation. Indeed, the FCC has "cogently explain[ed] why it has exercised its discretion" in the way it has. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

### III. CONCLUSION

For the reasons set forth above, we conclude that we do not have jurisdiction over Southwestern Bell's challenge to the FCC's interim prescription. We further conclude that the methodology employed by the FCC in evaluating the reasonableness of petitioners' rates was not arbitrary or capricious. Thus, the petition for review is denied.