**PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, et al., Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**El Paso Municipal Customer Group, et al., Intervenors.**

**Nos. 99–1390, 99–1399 and 99–1444.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 6, 2000.

Decided Jan. 12, 2001.

Harvey Y. Morris and David G. Leitch argued the causes for petitioners Public Utilities Commission of the State of California, et al. With them on the briefs were Mary Anne Mason, Douglas Kent Porter, Frederick T. Kolb and Katherine Bourke Edwards. Arocles Aguilar entered an appearance.

Laura J. Vallance, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were John H. Conway, Acting Solicitor, and Susan J. Court, Acting Deputy Solicitor.

Kenneth M. Minesinger argued the cause for intervenors El Paso Natural Gas Company and Dynegy Marketing and Trade. With him on the brief were Richard C. Green, Judy A. Johnson and Peter G. Esposito.

Before: GINSBURG, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Petitioners[1] seek review of four orders of the Federal Energy Regulatory Commission ("FERC") relating to three pipeline capacity sale contracts between El Paso Natural Gas Company ("El Paso") and Dynegy Marketing and Trade ("Dynegy") (formerly National Gas Clearinghouse). Petitioners contend that in approving the contracts, FERC abused its discretion and acted arbitrarily and capriciously by (1) not adhering more closely to antitrust principles, as instructed by the court in *Southern California Edison v. FERC,* 172 F.3d 74 (D.C.Cir.1999) ("*SoCal II*"), and as manifested by the pro-competitive purposes of FERC Order No. 636,[2] and (2) finding that a certain portion of the sold pipeline capacity, designated as "Block II" capacity, was not recallable if unused by Dynegy. Because the contracts expired in December 1999, we hold that the issues underlying the petitions are moot, and accordingly, we dismiss the petitions.

## I.

El Paso is one of four interstate pipelines delivering natural gas to California. In 1995, one of El Paso's major firm gas transportation customers, Pacific Gas and Electric Company ("PG&E"), notified El Paso that it would terminate its entire contract of mainline capacity effective December 1997. PG&E's "turnback," along with other smaller capacity relinquishments, would leave more than thirty-five percent of El Paso's firm capacity unsub-

scribed. Shortly thereafter, in 1996, El Paso negotiated a ten-year rate settlement with all of its direct customers concerning the impending excess capacity ("1996 Settlement"). The 1996 Settlement reduced El Paso's reservation charges and established a ten-year moratorium on general rate increases. The Settlement also divided PG&E's "turnback" capacity into three "blocks," designated as Blocks I, II, and III; these blocks had system-wide receipt points and primary delivery points to Topock, California. According to the 1996 Settlement, Block II capacity was subject to certain recall rights, upon notice, in favor of shippers located in PG&E's service territory in Northern California. FERC approved the 1996 Settlement on April 16, 1997. *See El Paso Natural Gas Co.,* 79 F.E.R.C. ¶ 61,028 (1997), *reh'g order,* 80 F.E.R.C. ¶ 61,084 (1997).

Although El Paso continued to seek buyers for the excess capacity, as of August 1997 more than 1200 MMcf per day of firm capacity remained unsubscribed. El Paso held an open season during August and September 1997 to sell the excess Block II and Block III capacity. In October 1997, El Paso entered into a transaction contract with Dynegy that committed most of the unsubscribed Block I, II, and III capacity to Dynegy for a two-year period, commencing January 1, 1998 and ending December 31, 1999. The transaction was divided into three separate contracts to reflect the different characteristics of the three blocks of capacity created

---

1. Petitioners are the Public Utilities Commission of the State of California ("CPUC"), Southern California Edison Company ("SoCal Edison"), Amoco Energy Trading Corporation, and Amoco Production Company (jointly "Amoco"). The petitioning parties before FERC in the four challenged orders were Amoco, Burlington Resources Oil & Gas Company, Marathon Oil Company, Williams Energy Services Company, Phillips Petroleum Corporation and Phillips Gas Marketing Company. *See El Paso Natural Gas Co.,* 89 F.E.R.C. ¶ 61,073, at 61,226 n. 4 (1999) ("*El Paso IV*"); *El Paso Natural Gas Co.,* 88 F.E.R.C. ¶ 61,139, at 61,405 n. 14 (1999) ("*El Paso III*"); *El Paso Natural Gas Co.,* 83

F.E.R.C. ¶ 61,286, at 62,187 n. 2 (1998) ("*El Paso II*"); *El Paso Natural Gas Co.,* 82 F.E.R.C. ¶ 61,052, at 61,200 (1998) ("*El Paso I*"). In addition, CPUC, SoCal Edison, and Exxon Company, U.S.A. participated in the proceedings before FERC. *See El Paso III,* 88 F.E.R.C. at 61,406.

2. *See* Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Order No. 636, FERC Stats. & Regs. ¶ 30,939, 57 Fed.Reg. 13,267 (Apr. 8, 1992) (rehearing orders omitted).

by the 1996 Settlement. Each contract included a revenue reduction mechanism ("RRM"), under which Dynegy's minimum pay obligation would be reduced if El Paso sold interruptible capacity above certain volume levels in competition with Dynegy's resale of the firm capacity it had purchased from El Paso.

On December 24, 1997, El Paso filed for approval of a revised tariff to include the terms of the El Paso–Dynegy transaction contract. *See* Natural Gas Act § 4, 15 U.S.C. § 717c(d) (1997) ("NGA").[3] On January 5, 1998, petitioners filed a protest, objecting, among other things, to the fact that the contracts, and particularly the RRM, were anticompetitive and inconsistent with the 1996 Settlement. In the first challenged order, dated January 23, 1998, FERC authorized the contracts to become effective January 1, 1998, subject to refund and the outcome of a technical conference, which was held on March 3, 1998. *See El Paso Natural Gas Co.,* 82 F.E.R.C. ¶ 61,-052 (1998) *("El Paso I").*

Petitioners filed a request for rehearing of the January 23, 1998 order. As relevant here, petitioners argued that FERC must apply antitrust principles in examining issues of competition and discrimination raised by the El Paso–Dynegy transaction. Petitioners asserted that, in light of established antitrust principles, the RRM was *per se* unlawful because it tended to restrain competition in the secondary transportation market, and that the El Paso–Dynegy contracts were anti-competitive in granting Dynegy excessive market power upon El Paso's transfer of the purchased capacity. *See El Paso Natural Gas Co.,* 83 F.E.R.C. ¶ 61,286, at 62,193 (1998) *("El Paso II").* In addition, petitioners asserted that El Paso's Block II contract with Dynegy contravened the 1996 Settlement by effectively denying Block II shippers access to the Northern California market. *See id.* at 62,199–200.

In its second challenged order, *El Paso II,* dated June 11, 1998, FERC denied the rehearing request. *See El Paso II,* 83 F.E.R.C. at 62,187–205. In *El Paso II,* FERC held that, "[w]hile [it] may apply anti-trust concepts in analyzing competitive issues ... [, it] is not charged with administering or enforcing the antitrust laws." *Id.* at 62,194. Rather, its obligation was to examine each transaction "in the context of [FERC's] current regulatory paradigm under the Natural Gas Act." *Id.* The relevant regulatory structure, FERC stated, was set forth largely in its Order No. 636 and subsequent rehearing orders, which provide, among other things, that interstate gas pipelines are not required to discount below the maximum lawful rate contained in their tariffs. *See id.* (citing Order No. 636–B, 57 Fed.Reg. 57,911 (Nov. 27, 1992); Order No. 636–A, 57 Fed.Reg. 36,128 (Aug. 3, 1992)). Further, FERC stated, Order No. 636 "specifically rejected assertions that anti-trust style regulation should play a central role in developing [its] regulatory paradigm." *Id.* Thus, FERC stated, the relevant analysis was whether, in light of the regulatory structure set forth in Order No. 636, the contracts at issue were unduly discriminatory. *See id.*

Applying this analytical structure, FERC concluded that, while the RRM reduced El Paso's incentive to compete and was therefore anti-competitive, it did not result in an unduly discriminatory situation in the gas transportation market to California. *See id.* at 62,196. First, the rate established by the contracts was far below the maximum transportation rate authorized by El Paso's tariff. *See id.* at 62,197. Second, the anti-competitive effect of the transaction was diminished by the "large amount of unutilized capacity that [was] available on pipelines serving California, the fact that this [was] a two-year

---

**3.** The NGA confers upon FERC rate authority over companies that engage in either the sale or the transportation of natural gas. Section 4 requires natural gas companies to file all rates and contracts with FERC. *See* 15 U.S.C. § 717c (1997). Section 5(a) authorizes FERC to modify, prospectively, any rate or contract that it determines to be "unjust, unreasonable, unduly discriminatory, or preferential." 15 U.S.C. § 717d(a) (1997).

transaction, that gas demand [was] not expected to increase in California in the next two years, and [that] capacity release rates remain[ed] well below the maximum ceiling." *Id.* at 62,198. In rejecting petitioners' anticompetitiveness arguments, FERC also cited *Southern California Edison Company v. Southern California Gas Company*, 79 F.E.R.C. ¶ 61,157, *reh'g denied*, 80 F.E.R.C. ¶ 61,390 (1997) ("*SoCal I*"), where FERC dismissed a complaint alleging abuse of market power by the Southern California Gas Company in the secondary release market for pipeline capacity on the ground that because the company had complied with the maximum tariff rate established by Order No. 636, there was "no need to engage in a further inquiry into market power." 80 F.E.R.C. at 62,302. Finally, FERC concluded that the contracts' provisions concerning the recall of Block II capacity were not unduly discriminatory, holding that shippers located in Northern California could not "recall Block II capacity simply because the capacity [was] not actually used by [Dynegy]." *El Paso II*, 83 F.E.R.C. at 62,200.

After *El Paso II*, the parties submitted two compliance filings, protests to those filings, and two additional requests for rehearing. In their second and third rehearing requests, petitioners again raised two principal issues: FERC's obligation to address the allegedly anti-competitive nature of the transaction, and the right of certain shippers under the 1996 Settlement to recall Dynegy's unused capacity to serve the Northern California market. *See El Paso Natural Gas Co.*, 88 F.E.R.C. ¶ 61,139 (1999) ("*El Paso III*"). In the meantime, the court reversed FERC's decision in *SoCal I* and remanded the case to the agency, holding that FERC's decision not to examine the market power issues raised by the petitioner was arbitrary and capricious. *See SoCal II*, 172 F.3d at 76.

In the third challenged order, *El Paso III*, dated July 29, 1999, FERC generally

denied rehearing on the anticompetitiveness and Block II capacity issues. *See El Paso III*, 88 F.E.R.C. ¶ 61,139. FERC interpreted the recent *SoCal II* decision as requiring it to examine allegations of anticompetitive behavior under its NGA authority to prevent undue discrimination. *See id.* at 61,406. Relying on Supreme Court and District of Columbia Circuit case law,[4] FERC stated that it need not "pursue only the competitive concerns embodied in antitrust principles." *Id.* at 61,407. Rather, its duty, under the NGA and *SoCal II*, was to balance the transaction's possible anti-competitive impact against the public policy goals in the NGA, namely, to protect consumers against "undue discrimination" while also assuring that the pipeline has a "reasonable opportunity to recover its costs and earn an adequate return." *Id.* at 61,407. Given these considerations, FERC concluded that because Dynegy's competitors were able to obtain capacity and reach the California market, and because the transaction allowed El Paso an improved opportunity to recover its costs and benefitted firm shippers receiving payments under the 1996 Settlement, the transaction was consistent with the NGA's public policy goals. *See id.* at 61,408. While continuing to recognize that the RRM was anti-competitive, FERC concluded that this was an "ancillary" restraint on competition that was necessary to allow El Paso to earn an adequate rate of return. FERC reiterated that the transaction was "not inconsistent with ... Order No. 636, particularly since Order No. 636 did not require pipelines to discount in response to competitive pressures." *Id.* at 61,426.

As to the Block II issues, FERC affirmed its previous holding that a shipper could only recall Block II capacity under contract to Dynegy if Dynegy was using the capacity for delivery to points outside Northern California. FERC reversed, however, its prior requirement that the

---

4. *See El Paso III*, 88 F.E.R.C. at 61,407 (citing *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Associated* *Gas Distributors v. FERC*, 824 F.2d 981, 995 (D.C.Cir.1987); *Northern Natural Gas v. FPC*, 399 F.2d 953, 959–73 (D.C.Cir.1968)).

Block II recall rights apply only if there were capacity constraints. *See id.* In addition, FERC rejected petitioners' argument that any Block II capacity that was not used by Dynegy after the first six months of the transaction be made available for recall by other shippers, finding nothing in the language of the 1996 Settlement to suggest a temporal limitation of Dynegy's rights. *Id.* at 61,421. FERC noted that petitioners did not suggest that any other shipper that might have acquired Block II capacity be subject to the same limitation. *See id.* In view of the excess capacity in the California market, FERC concluded that it was unreasonable to impose such a stringent standard on Dynegy. *See id.*

Petitioners' request for rehearing of *El Paso III* was denied by FERC in its fourth and final challenged order, dated October 19, 1999. *See El Paso Natural Gas Co.,* 89 F.E.R.C. ¶ 61,073 (1999) ("*El Paso IV*"). Relying in large part on its prior reasoning, FERC rejected petitioner Amoco's arguments that the transaction was inconsistent with the NGA, that the RRM should be held unlawful under all circumstances, and that Block II shippers had a right to recall Block II capacity to Northern California if Dynegy was not using it. *See id.* at 61,226–27. FERC also made clear that "[its] finding applie[d] only in the context of this Transaction." *Id.* at 61,226.

Amoco submitted a petition for review by this court on November 9, 1999. On December 31, 1999, the two-year contracts underlying the El Paso–Dynegy transaction expired. Shortly before the contracts' expiration, however, El Paso entered into two contracts with other parties—Enron North American Corporation ("Enron") and Williams Energy Marketing and Trading Company ("Williams")—for the capacity that would become available on January 1, 2000. In December 1999, El Paso proposed to revise its tariff to include the

terms of the new contracts. FERC modified the new contracts in an order issued on January 19, 2000. *See El Paso Natural Gas Co.,* 90 F.E.R.C. ¶ 61,050 ("*Enron Order*"). On January 28, 2000, however, Enron withdrew from the contract. After Enron's withdrawal, El Paso contracted with its marketing affiliate, El Paso Merchant, to use the capacity that Enron turned back ("El Paso Merchant Transaction"). Because that contract conformed to the standard contract in El Paso's tariff, El Paso was not required to obtain FERC's approval.

## II.

On appeal, petitioners contend that FERC acted arbitrarily and capriciously and abused its discretion, first, by failing to accord appropriate importance to the highly anti-competitive nature of the El Paso–Dynegy contracts, particularly in light of the court's decision in *SoCal II* and FERC's Order No. 636, and second, with regard to the Block II issues, by adopting an erroneous interpretation of the 1996 Settlement. FERC, in turn, responds that the court should dismiss the petitions for lack of jurisdiction because the contracts at issue expired in December 1999, thereby eliminating petitioners' constitutional standing and rendering moot the issues presented in the petitions; and, alternatively, assuming jurisdiction, the court should affirm the challenged orders because FERC acted reasonably and on the basis of substantial record evidence. We agree that the appeal is moot.[5]

Article III, Section 2 of the Constitution restricts federal courts to resolving "actual, ongoing controversies," *Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), rather than issuing advisory opinions or "decid[ing] questions that cannot affect the rights of litigants in the case before them." *Better Gov't Ass'n*

---

5. Because the jurisdictional questions arise from issues of timing, namely the expiration of the El Paso–Dynegy contracts, we approach the jurisdictional question in terms of mootness and, in light of our disposition, do not reach FERC's contentions concerning petitioners' alleged lack of standing.

*v. Department of State,* 780 F.2d 86, 90–91 (D.C.Cir.1986) (citation omitted). "For that reason, if [ ] event[s] occur while a case is pending on appeal that make[ ] it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed [as moot]." *United States v. Weston,* 194 F.3d 145, 147–48 (D.C.Cir.1999) (alterations in original) (quoting *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)); *see also Northwest Pipeline Corp. v. FERC,* 863 F.2d 73, 76 (D.C.Cir.1988). Ordinarily, it would seem readily apparent that a challenge to an expired contract is moot, because the court could provide no relief to the allegedly aggrieved parties. Petitioners, however, contend that their challenge falls within the exception to the mootness doctrine for cases that are "capable of repetition yet evading review." *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). To invoke this exception, petitioners have the burden to demonstrate that "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (alterations in original) (quoting *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 481, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)); *see also Weston,* 194 F.3d at 148.

■ Petitioners meet their burden as to the "evading review" requirement. Both the Supreme Court and this court have held that "orders of less than two years' duration ordinarily evade review." *Burlington Northern R. Co. v. Surface Transp. Bd.,* 75 F.3d 685, 690 (D.C.Cir. 1996); *see also Southern Pacific,* 219 U.S. at 514–16, 31 S.Ct. 279; *In re Reporters Comm. for Freedom of the Press,* 773 F.2d

1325, 1329 (D.C.Cir.1985). FERC issued its first substantive order on June 11, 1998.[6] *See El Paso II,* 83 F.E.R.C. ¶ 61,-286. Pursuant to NGA § 19(a), 15 U.S.C. § 717r(a) (1997), petitioners were obligated to seek rehearing of the June 11, 1998, order before seeking judicial review. *See ASARCO, Inc. v. FERC,* 777 F.2d 764, 771 (D.C.Cir.1985). FERC responded to petitioners' request for rehearing on July 29, 1999—five months before the December 31, 1999 expiration of the El Paso–Dynegy contracts. Even if petitioners had not sought further rehearing at that time, and had instead filed petitions for review in the court, it is unlikely that the issues would have been litigated and resolved before the contracts' expiration. Hence, it is clear that FERC's review of the two-year contracts at issue in this appeal did not provide "enough time to allow [the contracts'] validity to be fully litigated." *Maryland People's Counsel v. FERC,* 761 F.2d 768, 773 (D.C.Cir.1985).

■ Petitioners do not, however, satisfy the "capable of repetition" element of the mootness exception. The Supreme Court has held that "capable of repetition" means "a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam); *see also Honig,* 484 U.S. at 318–19, 108 S.Ct. 592; *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *Southwestern Bell Telephone Co. v. FCC,* 168 F.3d 1344, 1351 (D.C.Cir.1999). The Supreme Court has further required not merely a "physical or theoretical possibility" of recurrence, *Murphy,* 455 U.S. at 482, 102 S.Ct. 1181, but a "reasonable expectation" if not a "demonstrated probability" that petitioners will be subject to the same action. *Honig,* 484 U.S. at 319 n. 6, 108 S.Ct. 592; *Weinstein,* 423 U.S. at 149,

**6.** The initial order by FERC, dated January 23, 1998, merely deferred the substantive issues for resolution after the March 3, 1998, technical conference. *See El Paso I,* 82 F.E.R.C. at 61,200–201. Because this order

did not rule upon the merits of the issues, it was not a final order from which petitioners could have sought judicial review. *See ASARCO, Inc. v. FERC,* 777 F.2d 764, 771 (D.C.Cir. 1985).

96 S.Ct. 347. Generally, courts have interpreted "same action" to refer to particular agency policies, regulations, guidelines, or recurrent identical agency actions. *See, e.g., Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 123–26, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Southwestern Bell Telephone Co.,* 168 F.3d at 1351; *Burlington Northern,* 75 F.3d at 688–90; *Doe v. Sullivan,* 938 F.2d 1370, 1376–79 (D.C.Cir. 1991); *American Trading Transp. Co. v. United States,* 841 F.2d 421, 425–26 (D.C.Cir.1988); *Better Gov't Ass'n,* 780 F.2d at 91. Petitioners maintain that they satisfy the "capable of repetition" requirement by adopting a more general definition of "same action": (1) continued supracompetitive transportation and fuel prices, and (2) FERC's continuing application of an erroneous interpretation of the 1996 Settlement concerning the Block II recall issue. Specifically, petitioners maintain that FERC's approval of El Paso's post-Dynegy contracts with Enron and El Paso Merchant for the capacity that would become available after December 31, 1999, demonstrates that petitioners will be subjected to the same anti-competitive harm and the same flawed legal analysis that FERC tolerated in its approval of the Dynegy transaction. We are unpersuaded.

As to the allegedly continuing anticompetitive effects, petitioners do not demonstrate a "reasonable expectation" that they will be subjected to the future harm that they consider the "same action." Rather, they contest FERC's method of analysis concerning possible contract approval, namely, FERC's practice of balancing the possible anti-competitive effects of a transaction with the objectives of the NGA and FERC's own policies. Implicit in petitioners' contentions, however, is a challenge to FERC's case-specific, factual determinations concerning the California market. Yet in approving the El Paso–Dynegy contracts, FERC made clear that its future balancing of competition concerns with the goals of the NGA and existing FERC policies may yield different results than those of the El Paso–Dynegy order: "A change in market conditions, for example, a signif-

icant increase of the demand for firm transportation to California, or a change in [FERC] policies on the right of pipelines not to discount, might result in a different conclusion." *El Paso III,* 88 F.E.R.C. at 61,414. Further, in its final order, dated October 19, 1999, FERC reiterated that its "finding applie[d] only in the context of [the El Paso–Dynegy] transaction," and that it thus did not "reach the question of whether an RRM or similar provision must be prohibited in any future contracts." *El Paso IV,* 89 F.E.R.C. at 61,226. Because FERC has made clear that its conclusions concerning the El Paso–Dynegy transaction did not represent continuing FERC policy, and because the conditions on which FERC bases its balancing admittedly change over time, petitioners fail to establish a reasonable expectation that FERC's method of balancing will yield anti-competitive harm to them in the future. *Cf. Columbian Rope Co. v. West,* 142 F.3d 1313, 1317 (D.C.Cir.1998); *Ramsey v. Kantor,* 96 F.3d 434, 446 (9th Cir. 1996).

To the extent that petitioners rely on the Enron and El Paso Merchant contracts as indicative of future supracompetitive harm that will result from FERC's flawed analysis, petitioners fail to show the necessary parallels between these new contracts and the contracts upheld in the El Paso–Dynegy orders. The Dynegy contracts are materially different from the subsequent contracts entered into by El Paso. As petitioners acknowledge, the Enron contract, from which Enron later withdrew, did not contain the RRM, which was the key element that petitioners claimed made the El Paso–Dynegy transaction impermissibly anticompetitive. That FERC considered the competition issues raised by the El Paso–Enron transaction and drew upon its analysis in *El Paso II, El Paso III,* and *El Paso IV* to approve the Enron transaction, *see Enron Order,* 90 F.E.R.C. ¶ 61,050, does not necessarily indicate that FERC was implementing the same policy or that FERC incorporated the same factors in its balancing. Fur-

ther, the El Paso Merchant contract involved a sale of pipeline capacity to an El Paso affiliate; because the contract with El Paso Merchant conformed to the standard contract in El Paso's tariff, El Paso was not obligated to seek approval from FERC. Were FERC to examine this contract, however, the relationship between El Paso and El Paso Merchant would trigger different concerns than a transaction between unrelated parties. Hence, petitioners' challenge to a method of reasoning that may or may not lead to the approval of future pipeline capacity sale contracts with anti-competitive features fails to establish a "reasonable expectation" that petitioners will be subjected to the same alleged harm.

 Petitioners' contentions concerning the Block II issues would generally satisfy the "capable of repetition" prong. Because the El Paso tariff has not yet expired, it is likely that FERC will continue to interpret the 1996 Settlement as barring the recall of idle block capacity. FERC has already invoked this same interpretation in its approval of the El Paso–Enron contract. *See Enron Order,* 90 F.E.R.C. ¶ 61,050. Despite this potential for lasting effect, however, the court is limited to evaluating only the arguments that petitioners presented to FERC. *See United Transp. Union v. Surface Transp. Bd.,* 114 F.3d 1242, 1244–45 (D.C.Cir.1997); *United Transp. Union v. ICC,* 43 F.3d 697, 701 (D.C.Cir.1995); *Washington Ass'n for Television and Children v. FCC,* 712 F.2d 677, 680 (D.C.Cir.1983). Before FERC, petitioners challenged FERC's interpretation only insofar as FERC had failed to apply a temporal limitation to Dynegy: Petitioners "propose[d] that any Block II capacity that was not actually used by Dynegy to serve customers in northern California within the first six months of the Transaction should be available for recall by other shippers." *El Paso III,* 88 F.E.R.C. at 61,421. As FERC noted, petitioners "[did] not suggest that any other shipper that may acquire Block II capacity should be subject to the same limitation." *Id.; see also El Paso IV,* 89 F.E.R.C. at

61,227. Because petitioners' challenge before the agency was limited to the specifics of the Dynegy situation, seeking to impose a temporal limitation only upon Dynegy but not upon any other present or future Block II shipper, the specific claim raised by petitioners is not "capable of repetition."

Accordingly, we dismiss the petitions for review as moot.